MARY MACDONALD, Appellant, *v.* THE COMMERCIAL TRAVELERS MUTUAL ACCIDENT ASSOCIATION OF AMERICA, Respondent.

First Department, June 22, 1937.

*Otho S. Bowling,* for the appellant.

*Henry C. Moses* of counsel [*Moses, Nehrbas & Tyler,* attorneys], for the respondent.

GLENNON, J. This action is based upon a contract whereby the defendant insured one Don MacDonald, among other things, against the loss of his life by accidental means. It was instituted by Mary MacDonald, decedent's wife, who was named as beneficiary.

In the complaint it is alleged that on the 23d day of August, 1933, Don MacDonald died as the direct and approximate result " of * * * accidental means." The respondent interposed three defenses. It is unnecessary to discuss the first defense, since it was conceded by counsel for the respondent that there was no proof in the record to sustain it. The second defense was based upon the following provisions of the certificate and contract of insurance: " The insurance under this contract does not * . * * extend to or cover any loss mentioned in Sections A and B of this certificate when the accident causing such loss happens while the member is insane." For a third defense, the following provisions of the certificate were set up: " The insurance under this contract does not * * * extend to or cover any loss mentioned in Sections A and B of this certificate when the accident causing such loss happens while the member is insane or under the influence of intoxicating drink or narcotics, or in consequence thereof." In short, two defenses were relied upon by the respondent, to wit, insanity and intoxication. We do not believe that the respondent established upon the trial that MacDonald was either insane or intoxicated when the accident, which caused his death, occurred.

The proofs adduced indicate that the deceased was found dead in the courtyard in the rear of the building in which he resided on West Fifty-seventh street in the city of New York. He had fallen from a bathroom window five stories above, had struck a sloping roof and was precipitated into the yard. The cause of death was a fracture of the skull.

Mrs. MacDonald testified, in substance, that her husband was not at home during the night before the accident. She was worried about his failure to appear and, as a consequence, about midnight she notified the police department. At seven o'clock on the morning of August 23, 1933, she received a telephone call from a man who worked in a restaurant known as King's Tavern on Eighth avenue between Thirty-fourth and Thirty-fifth streets. In company with her brother-in-law, Hugh A. Lamb, she went to the restaurant. MacDonald told her that he went into the tavern to rest, " he had walked around so much — that he could not find his way home, and * * * he ordered a couple of glasses of beer — we were having two per cent then — * * *. He did

not say he drank it, but he paid for it anyway there, but whether he drank it I do not know. I did not ask him."

The deceased, after arriving home, went to bed "because he was very tired after sitting up all night in there." About eleven-twenty A. M. MacDonald called his wife and, as the result of a talk, "I asked him if he wanted an enema — I fixed the bag for the enema, hung it up near the window." The deceased entered the bathroom. Mrs. MacDonald went into the kitchenette to prepare coffee. She then heard a noise, as she put it, "Sort of a thud." She looked out of the kitchen window but could not see anything.

The photograph in evidence indicates that the bathroom had but one window. Mrs. MacDonald said it was her custom to leave the window open, not only in the summer, but also in the winter. The bathroom window was seventeen and five-eighths inches across. There is an opening of thirty-one inches in height when the lower window is pushed to the top. The sill is twenty-six inches above the floor and the width of the sill is fourteen and three-fourths inches. Whether or not it was the intention of the deceased to close this window preparatory to taking the enema, we do not know. However, the fact remains that it was from this window that MacDonald fell.

Hugh A. Lamb, called as a witness by the respondent, stated that he went to King's Tavern with the appellant, and that he had occasion to observe him on the way home. He described his condition to the jury as being "The same as it always was." Further, he said, that he did not smell the odor of alcohol, either on the way home or upon the arrival of the medical examiner after the accident. On cross-examination, he said that upon his arrival at King's Tavern, "I walked in, said, 'How do you do? Hello Don.' He said, 'Hello, Hugh.' I said, 'Put on your overcoat.' He said, 'I have no coat with me.' I said, 'I brought your coat.' He said, 'I·won't need it.'" The cross-examiner then asked, "Was he drunk or sober?" The witness replied, "Why, I have never seen the man drunk in my life." Then the following questions were asked and answers given: "Q. Did you smell any alcohol? A. I did not. Q. Did he talk coherently? A. Yes. Q. Did he walk with his normal gait? A. Yes. Q. He did not stagger? A. No. Q. Speech normal? A. Yes. Q. Did you observe anything abnormal? A. No. Q. About his talk? A. No." He said that upon their arrival at MacDonald's house he noticed that his right leg was very badly swollen down near the top of the shoe. He offered to remove the shoe, but MacDonald told him that he could do that himself. Further, on the day of

the accident, he tried the window. He said, "It was very hard to close. I do not think I even closed it. I think I tried it but it was very hard to close."

Dr. Henry Weinberg, an assistant medical examiner, called as a witness by the respondent, testified that he detected an odor on the body, "that smelled like alcohol."

Dr. Benjamin M. Vance, an assistant medical examiner of the city of New York, also called by the respondent, performed the autopsy upon the body of the deceased. He testified that he did not find any edema of the brain. He found some fluid in the leg and also arteriosclerosis.

Dr. Lawrence Sophian, called as a witness by the appellant, testified that he was present at the autopsy. He stated that the cause of death was "traumatic fracture of the skull with lacerations of the brain and intercranial hemorrhages." There was an edema of the brain, "which I took to be connected with heart failure, which had been existing for some time." He was asked on cross-examination, "You think that the heart disease which he had had for some time had caused edema in the brain? A. Yes. Q. Does that deprive the man of his sanity? A. It usually gives them fits of irrationality and loss of muscular control, sometimes with passing convulsions — fleeting convulsions. Q. Deprive a man of his sanity? A. No, not — Q. Make him irrational? A. From time to time for a few minutes."

We have set forth in some detail the evidence which was offered in this case on the question of insanity and intoxication. We believe that it falls far short of establishing that the deceased was either insane or intoxicated at the time he met his death.

Since it is necessary to order a new trial, it might be advisable to point out that the court properly instructed the jury upon the question of the burden of proof. It must be remembered that it was the contention of the appellant that the deceased met his death through accidental means at a time when he was not insane or under the influence of intoxicating drink.

For the reasons assigned the judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

MARTIN, P. J., DORE, COHN and CALLAHAN, JJ., concur.

Judgment unanimously reversed and a new trial ordered, with costs to the appellant to abide the event.